## SIMEON J. AHERN, Appellant, *v.* WILLIAM H. GOODSPEED and another, Respondents.

*Usury — Promissory notes — sale of by broker — principal bound by representations of broker.*

Where the maker of a note places the same in the hands of a broker to be sold by him, without any restrictions as to the manner in which such sale is to be made, he is bound by the representations made by the latter to a *bona fide* purchaser, to the effect that the same is good and valid business paper; and he cannot maintain an action to have the note canceled, on the ground that it never had any legal inception until it came into the hands of the purchaser, by whom a greater discount was reserved than is allowed by law.

APPEAL from a judgment in favor of the defendant, entered upon the trial of this action by the court without a jury.

The action was brought to have three promissory notes made by the plaintiff to his own order adjudged void, on the ground of usury, and to have certain shares of stock transferred by him as collateral thereto surrendered.

*M. W. Divine*, for the appellant.

*R. H. Huntly*, for the respondent.

BRADY, J.:

The plaintiff seeks to be relieved from the burden of his notes, held by the defendant Goodspeed, and tainted, as he alleges, with usury, and void; and his right to success depends upon the power of his brokers to make the representations which were made, that the notes discounted were business paper. The notes were given to Bound & Company to dispose of. They were to be sold, and the proceeds applied to the payment of the debt due by him to them. They were note brokers. It was their business — in part, at least — to sell notes. When the notes were delivered, it must be assumed, because it is so found, that nothing was said authorizing them to make any representation, but they were empowered to sell. They did sell. The sales were approved of on the terms stated on the memoranda of sale, and the plaintiff had the benefit of the money realized. There were three notes, one of which was for $9,500. It was the first taken by the defendant, and was sent to him by the brokers in place of the paper of a Mr. Adams whose notes he had previously bought. He had heard of the plaintiff from his brokers. They mentioned the plaintiff's name when, in an interview several days before the note mentioned was sent, the defendant was negotiating for notes. In that interview the defendant stated what he wanted to purchase, namely, undoubted business paper, and the brokers could not fail to have understood it. After this revelation the name of the plaintiff in connection with notes was mentioned. When, therefore, the plaintiff's note was received, the defendant had the right to assume that it was good business paper, and therefore subject to barter. This impression was confirmed

when, subsequently, in his communication with the brokers, they so substantially declared it to be. The other notes were accepted upon the express understanding, accompanied by representation of the brokers to that effect, that the notes were business paper. It may be here suggested that the notes were *quasi* business paper. They were, in fact, given to pay the brokers who were creditors of the plaintiff, and to whom they were delivered for that purpose. It is true that the arrangement authorized the brokers to sell them at a discount of twelve per cent, and that the plaintiff was to submit to the charge, but the notes in their inception were to be employed to pay the debt due to the brokers, and were actually used for that purpose. The money received was so appropriated, and the whole transaction ratified by the acquiescence of the plaintiff. Without, however, pursuing this suggestion further, and looking at the other circumstances disclosed, let us see what must be the result. The note of $9,500 was given to the brokers to sell, and they were not restricted by any instructions, except so far as the rate of discount agreed upon may be regarded as bearing upon that subject, and which is not material. The interview between the defendant in reference to the purchase of notes must, in justice, be regarded as a part of the transfer of that note. It was then distinctly stated, and understood between the brokers and the defendant, that business paper alone was to be the subject of barter. The defendant purchased nothing else from them. He was, therefore, entirely justified in relying upon that interview, and in assuming that the note sent him was in accordance with his demand. If there were any thing on the paper itself which would *per se* determine the question, he might be subjected to the rule of *caveat emptor*, but there was not, and the connection of the note with the understanding mentioned was the natural and obvious line of thought and action. If the transaction was not to be such as agreed upon, it was the brokers' duty so to advise the defendant. It should, therefore, be held that the representation was made that the note was business paper. If it be otherwise declared, then the brokers would be allowed to do indirectly what they could not do directly, and a fraud would be sanctioned. This result places the note of $9,500 on a par with the others, as to which the representation that they were business notes was directly

made. The plaintiff was bound by the representations thus made, and he is estopped from denying them under the circumstances, unless there was no power residing in the brokers to bind him by what they said. The notes, as already suggested, were placed in their hands for sale or discount, and whatever was within the sphere or scope of that employment — whatever was to be done to make it successful — was clearly delegated to them to perform. The broker could not be expected to sell notes or have them discounted, by silently presenting them to a purchaser. He must be expected to know something of them, and what he assumes to know legitimately connected with them, and necessarily a part of them, if stated by him, is as binding as if uttered by the principal. The latter has placed the broker in a position to do wrong, and if the trust be violated, the innocent dealer must be protected. The choice of the medium rests with the seller, and he must take the consequences. Hence an agent having power to sell goods, without express directions as to the mode, may sell them by warranty (*Andrews* v. *Kneeland*, 6 Cow., 354; *Nelson* v. *Cowing*, 6 Hill, 336; Story on Agency, § 137; *Ferguson* v. *Hamilton*, 35 Barb., 427); and hence, when the acts of the agent will bind the principal, his representations respecting the subject-matter will bind him; if made at the same time, they constitute part of the *res gestæ*. Hence, also, the rule that an agent employed to sell a note will bind his principal, even by a false representation. (Story on Agency, §§ 134, 137; *Elwell* v. *Chamberlain*, 2 Bosw., 230; *Ferguson* v. *Hamilton*, *supra*.) The last authority cited, which is an elaborate consideration of the subject and the cases bearing upon it, presents facts similar to those shown in this case, and is directly in point. All these principles are the legitimate offspring of the selection of the representative, who is clothed with the means of doing wrong, and for whose acts the principal should be held responsible in equity and good conscience, when done within the scope of his agency. There are no other questions involved in this appeal, and the judgment should therefore be affirmed, with costs.

DAVIS, P. J., and DANIELS, J., concurred.

Judgment affirmed.