BUFFIT *vs.* THE TROY AND BOSTON RAIL ROAD COMPANY.

It is not unlawful, nor against public policy, for a rail road company to convey passengers by stage to and from one of its stations and an adjacent village, in connection with and as a part of its business of transporting passengers upon its road; nor is a contract made by it, thus to carry a passenger, *ultra vires.*

Such a contract is lawful, and the rail road corporation is estopped from denying its validity.

Where a rail road company employs an individual to convey passengers to and fro between a village and a station on the rail road, in stage sleighs

furnished, together with the horses and drivers, by him, such company is liable in damages for any injury sustained by a passenger in consequence of the overturning of a stage-sleigh through the negligence of the owner or his servant.

APPEAL from a judgment at the circuit. The action was brought to recover damages for injuries sustained by the plaintiff, by the overturning of a stage-sleigh employed by the defendant for the purpose of conveying passengers to and fro between the village of Schaghticoke Point and the Schaghticoke station on the defendant's rail road, distant about a mile from said village, and was brought to trial before Justice HOGEBOOM and a jury, at the Rensselaer circuit, on the fourth Monday of May, 1860. The following is a brief statement of the material facts in the case:

The defendant is an incorporated company, authorized to construct and operate a rail road from the city of Troy to the state line of Vermont, at or near Pownal. Such rail road passes about a mile from the village of Schaghticoke Point, at what is called Schaghticoke station. Passengers on the defendant's rail road, going to or from the village of Schaghticoke Point, had, ever since the opening of the road, been conveyed in omnibuses, stage-wagons or sleighs, which, in going to the trains, ordinarily started from the upper end of the village and passed down through the main street, stopping along for passengers. The conveyances used for this purpose were furnished by John Downs, who was, together with his conveyances, horses and servants, hired by the defendant, at a daily compensation, to carry passengers between the village and the station; and said Downs was in the defendant's employ for that purpose at the time of the occurrence out of which this action arose. On the day of the occurrence, (March 11, 1857,) the plaintiff took passage, at the lower end of the village of Schaghticoke Point, on the stage-sleigh, then driven by one of Downs' men, for the purpose of coming to Troy by the defendant's rail road. As the sleigh stopped, the driver told the plaintiff that it was full

inside, and he (plaintiff) got on the outside. The defendant had no ticket office at the village of Schaghticoke Point, but Downs sold tickets. Passengers generally purchased their tickets of Downs after reaching the depot, but sometimes at the village. The plaintiff had not purchased one on that occasion. Between the village and the depot the sleigh was overturned, and the plaintiff received the injuries for which this action was brought. No question is now made that the driver was guilty of negligence which was the immediate cause of the overturning of the sleigh, nor that the plaintiff thereby sustained severe injuries, and accordingly all of the evidence on these points is omitted in the case.

When the plaintiff had rested, the defendant moved for a nonsuit, on the following grounds: 1. No proof of a contract to carry the plaintiff as a passenger. 2. No money having been paid by the plaintiff, nor information given by him that he designed to be a passenger, he did not become such, and the defendant was not bound to him by contract or duty, and is not liable for the injuries in question. 3. The defendant is a common carrier only by rail road; and had not power under its charter to contract to carry the plaintiff from Schaghticoke Point by stage to Schaghticoke station, and such contract, if made, was illegal and void. 4. The defendant is not estopped from denying the obligation of a contract which it had no power to make.

The nonsuit was refused, and the defendant excepted. The motion was renewed at the close of the evidence, on the same grounds, again denied, and the defendant again excepted. The court, among other things, charged the jury, 1. That the defendant had a right to employ Downs and his vehicles to transport passengers from Schaghticoke Point to the station, and from the station to the point, and that this was legitimately connected with the business of rail road transportation. The defendant excepted. 2. That the defendant might lawfully contract to carry rail road passengers from Schaghticoke village to the station, and might lawfully

employ stages for that purpose. The defendant excepted. 3. That it was a question of fact for the jury whether the plaintiff became a passenger with the defendant, and the burthen of proof was with the plaintiff. The jury rendered a verdict for $450 damages, on which judgment was perfected on the 22d of June, 1860, and the defendant appealed to this court.

*W. A. Beach*, for the plaintiff, (respondent.)

*D. L. Seymour*, for the defendant, (appellant.)

HOGEBOOM, J. Two questions are made in this case:
1. Was the plaintiff a passenger with the defendant.
2. Was the contract for carrying by stage a lawful one.

I. As to the first question, the proof was sufficient to go to the jury, and it was submitted to them with instructions that the plaintiff held the affirmative.

1. The stage was run in connection with the rail road, and so far as appears, for no other purpose.

2. It was not customary to pay the fare until reaching the depot. The omission to tender it was not therefore any evidence that the plaintiff was not a passenger.

3. The *presumption* is, that the plaintiff entered the stage intending to take passage by *rail*.

4. The proof (received without objection) is express that such was his intent.

5. These facts made a legitimate case for the jury, and the question being fairly submitted to them, their verdict on this point should not be disturbed.

II. Was the business of the defendant, in running the stage in connection with its rail road, *unlawful*, and the contract to convey the plaintiff by stage *ultra vires ?*

1. It must be conceded that the right to run a stage was not one of the *express* powers granted by the charter; nor

perhaps an *implied* power *indispensably* necessary to carry into effect the express powers.

2. But it was nevertheless a power *convenient and proper* for the successful transaction of the business of the defendant, promotive of the objects of the corporation, and conducive—at least not injurious—to the interests of the public.

3. It appears to have been exercised in strict subordination to the principal objects of the incorporation, to wit, the transportation of passengers and freight by rail, with safety, convenience and dispatch. It was not made an *independent* business, carried on for purposes of speculation, nor with a view to compete with rival conveyances from the village, by stage, but strictly *incidental* to rail road operations, and confined to the immediate neighborhood of the depot.

4. In itself the business was not an unlawful nor a prohibited one; nor was it, to the limited extent it was carried on, against public policy.

5. Under these circumstances, can it be said to be unlawful, or beyond the just powers of the corporation, fairly and reasonably construed?

6. If so, then *any* conveyance of passengers by stage between the termini of different rail roads in a city, or between disconnected portions of the same rail road, disconnected by accident or design, permanently or temporarily, is illegal if carried on by the rail road company. And any conveyance of passengers by the rail road, if it happens to traverse in any portion of its route, land not expressly dedicated to the rail road company, or the title to which has not been legally acquired, is also illegal.

7. I am inclined to think that as the business, irrespective of the charter, was lawful in itself, plainly promotive of the objects of the incorporation, not pushed beyond a needed accommodation to the immediate neighborhood, and not violative of any principle of public policy, the business was lawful.

8. It seems also to be settled by judicial decision, at least

so far as this court is concerned, that such a contract is lawful, and that the defendant is estopped to deny its validity.

In *Weed* v. *The Saratoga and Schenectady Rail Road Co.*, (19 *Wend.* 534,) the action was to recover the value of a trunk and its contents, lost on the rail road somewhere between Saratoga and Albany. And the court held that the defendants, though their rail road terminated at Schenectady, were liable for the loss, even though it occurred at a point beyond the limits of their road, if they had contracted to carry the whole distance; and that having held themselves out to the public as common carriers for the entire route, and having received compensation for the whole distance, they were bound by their contract and estopped from denying its binding force.

In *Hart* v. *The Rensselaer and Saratoga Rail Road Co.*, (4 *Seld.* 37,) the defendants were held liable for baggage put on board at Whitehall, and lost somewhere between Whitehall and Troy, although the distance between those termini was traveled by three distinct rail roads, and the defendants' road embraced only the latter end of the route; the proof being that the contract was made with the Saratoga and Washington Rail Road Company at Whitehall for the entire distance, and that the three different rail road companies acted under a mutual contract, by which they agreed to carry the entire distance and divide the profits between them.

In *Cary* v. *Cleveland and Toledo Rail Road Co.*, (29 *Barb.* 35,) this court enforced a similar rule, under similar circumstances; the only difference being, that the action was brought against the first of the three companies interested in the contract, and who made the contract and received the baggage; and that the loss occurred beyond the bounds of the state where the rail road was chartered, and of course beyond the limits to which its powers as conferred by such charter extended.

In *Bissell* v. *The Michigan Southern and Northern Indiana Rail Road Co.*, (22 *N. Y. Rep.* 258,) the defendants

were held liable for an injury to a passenger, occurring by the negligence of their agents in Illinois, while the defendants were operating a rail road route from Chicago to Lake Erie, the injury occurring at a point beyond either of the states of Michigan or Indiana, by which states alone the defendants' companies were respectively chartered, and under which charters alone they had the power to act. The general question of the liability of rail road companies for their contracts and their torts was largely and learnedly discussed; and although the views of members of the court did not entirely harmonize as to the grounds upon which the judgment should proceed, they nevertheless held that the defendants were either liable for the breach of a contract which they had lawfully made or were estopped to deny, or for a breach of duty to an individual received into their cars with their knowledge and consent, and whom, thus receiving, they were bound to transport with reasonable prudence and care.

The same question was further discussed in the subsequent case of *Parish* v. *Wheeler*, (22 *N. Y. Rep.* 494,) and it was there held that, though a rail road corporation exceeded its legal powers in the purchase of certain canal boats and a steamboat, intended to promote and facilitate the business of their road, the corporation nevertheless by the purchase acquired a title to the property, and could not, nor could any one claiming under them, set up such violation of duty to defeat the title of a mortgagee thereof; and further, that the corporation could not defend itself against a claim for money paid at its request to one who advanced the money for the price of the steamboat purchased for it, on the ground that the purchase was *ultra vires;* although the plaintiff, when he paid the money, knew all the facts ; nor on the other hand would the plaintiff, having sold the steamboat under his mortgage, refuse to credit the proceeds, on the ground that the transaction which furnished the consideration of the mortgage was *ultra vires* on the part of the corporation.

A distinction is attempted to be raised between these cases

and the one at bar, upon the ground that in those cases the business was strictly a rail road business, while here it was a stage business; but I am inclined to regard it a "distinction without a difference." The contracts, in all of these cases, seem to me to be as much *ultra vires* (if so at all) as in the case at bar. They had strictly no power to contract for rail road operations, or rail road liability, beyond the bounds of their respective routes and states. It is true their business was in its nature a legitimate rail road business. But I have endeavored to show, in a previous part of this opinion, that the business pursued by the defendant on this occasion was a legitimate rail road business—not done exclusively *on* its rail road, to be sure—but connected with it and appurtenant to it—incidental entirely to rail road transportation—done to advance that interest by concentrating travel and freight at the rail road station by other means and appliances, within a narrow circle of territory in the immediate neighborhood, and not designed to set up an independent and substantive business, competing with other interests, disconnected with and dissimilar to the legitimate rail road operations for which it was chartered.

III. But suppose the contract and business in question to be unlawful, in the sense that it exceeded the powers granted by its charter, is the defendant released from liability? On this subject several considerations seem to me to be worthy of notice, and to possess considerable force.

1. The defendant had been *long* engaged in this stage business—indeed, ever since it had existed as a corporation. This appears from the evidence. It must be *presumed* to have been *known* to the stockholders, who never in any way arrested it.

2. It must also be presumed, from the absence of evidence to the contrary, that the stockholders participated in the benefits of this arrangement, and thus approved and *adopted* the unauthorized acts of their directors and managers. In this particular instance they did the same thing as *taking* the

money of the plaintiff and agreeing to transport him safely to Troy.

3. I incline to think—under the authorities before quoted, and the general principles of law—that it is *estopped* from denying its liability for the acts of its agents, as much as a party would be who, knowing that a note was infected with *usury*, and therefore void, nevertheless represents it as valid business paper, on the faith of which represent- ation it is taken. (*Watson* v. *McLaren,* 19 *Wend.* 357. *Holmes* v. *Williams,* 10 *Paige,* 326. *Clark* v. *Sisson,* 4 *Duer,* 408. *Truscott* v. *Davis,* 4 *Barb.* 495. *Chamberlain* v. *Townsend,* 26 *id.* 611.)

4. At all events, receiving the plaintiff into its stage with its consent, it was under a duty to transport him with ordi- nary care, and are responsible for a neglect of that duty. (*Bissell* v. *M. S. and N. I. R. R. Co.,* 22 *N. Y. Rep.* 258.)

This latter point was not presented at the trial, nor ruled by the court, and there is some doubt, perhaps, whether it ought to be employed here to prevent a new trial, although I do not see why, if well taken, it will not be fatal to the defendant's case, if the weight of evidence on the question of negligence be conceded to be with the plaintiff. The essence of the charge was, that the defendant was liable for negligence in the conveyance of the plaintiff.

I am prepared, however, if necessary, to rest the affirm- ance of the judgment upon the grounds taken by the judge at the trial.

The judgment should be *affirmed.*

Peckham, J. concurred in the result of the foregoing opinion.

Gould, J. expressed no opinion.

Judgment affirmed

[Albany General Term, March 3, 1862. *Gould, Hogeboom* and *Peckham,* Justices.]